## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION AS RECEIVER FOR CHAMPION BANK,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.** |
| | ) | |
| **vs.** | ) | |
| **LANE ALPERT, CARLO DIMARIA, JEFFREY NAGLE, ROBERT UTHOFF, CHARLES BONO, III, MICHAEL DENCKHOFF, CHRISTOPHER KEHR, JEFFREY MUGG, JOHN PRENTIS, and PAXTON SCHNEIDER,** | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver for Champion Bank, Creve Coeur, Missouri ("FDIC-R") complains and alleges against Defendants as follows:

## I.    INTRODUCTION:

1.     On April 30, 2010, the Missouri Department of Finance closed Champion Bank ("Bank" or "Champion") of Creve Coeur, Missouri and the FDIC was appointed Receiver pursuant to 12 U.S.C. § 1821(c).[1]  By operation of law, the FDIC-R succeeded to all the rights, titles, and privileges of the Bank and its depositors, account holders, other creditors, and

---

[1] The FDIC's mission is to maintain stability and public confidence in the nation's financial system by insuring deposits, examining and supervising financial institutions for safety and soundness and consumer protection, and managing receiverships.

stockholders.  12 U.S.C. § 1821(d)(2)(A)(i).  This includes the right to bring actions against the Bank's former officers and directors for mismanagement and other tortious conduct causing losses to the Bank.

2.    The FDIC-R brings this action against ten former officers and directors of the Bank for negligence, gross negligence, and breach of fiduciary duty in the underwriting, recommendation, and approval of seven high-risk out-of-territory commercial real estate ("CRE") loan participations and two business lines of credit (collectively, the "Loss Transactions"), resulting in damages of at least $15.56 million.  Defendants failed to adhere to their duties of care and loyalty, violating regulatory standards, fundamental principles of safety and soundness, and Champion's own policies.

3.    Champion's loan officers, their supervisors, and the Bank's Chief Credit Officer were responsible for the quality and integrity of the Bank's loan underwriting.  They were required to prudently underwrite loans and other transactions, and to comply with the Bank's Credit Policy Guide ("Credit Policy").  Prudent underwriting requires, among other things, that a lending official verify that borrowers are creditworthy and able to repay a loan as agreed, verify the existence of realistic secondary repayment sources, and conduct an analysis to determine whether a proposed project or development is feasible and likely to be completed on time with the funds available.

4.    In order to provide a check against the risk of negligent or reckless lending by management, members of Champion's Loan Committee ("LC") – particularly the non-management directors – were required to critically review management's loan recommendations prior to approving them.  LC members had a duty to familiarize themselves with the Bank's Credit Policy and to exercise reasonable care to ensure that management was adhering to that

2

policy, as well as to the Bank's business plan, regulatory standards, and fundamental principles of safety and soundness. LC members were not permitted merely to rubber stamp management recommendations. This multi-layered underwriting, recommendation, and approval process, which occurs at most banks, was intended to protect Champion from loss and possibly failure.

5.    Defendants abdicated these responsibilities by repeatedly disregarding the Bank's Credit Policy, safe and sound banking practices, and regulatory standards. Defendants knew or recklessly disregarded the fact that the Loss Transactions lacked adequate primary and secondary repayment sources and suffered from serious underwriting failures that created a high risk of loss. Defendants failed to obtain or analyze repayment sources, failed to obtain and prudently analyze obligors' financial information, and gave little if any consideration to the viability of development projects in light of deteriorating market conditions.

6.    Defendants' negligence, gross negligence, and breach of fiduciary duty resulted in damages of at least $15.56 million, and on April 30, 2010, Champion failed and the FDIC-R was appointed receiver.

## II.    PARTIES

7.    The FDIC-R brings this case in its receivership capacity under authority granted in 12 U.S.C. § 1821. Under 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R succeeded to all rights, titles, and privileges of Champion and its stockholders, account holders, and depositors, including claims against each of the Defendants asserted in this case, as provided for in 12 U.S.C. §§ 1821(d)(2)(A) and (k) and 1823(d)(3)(A).

8.    Defendants, their respective roles during the operation of the Bank, and the manner of service of process are as follows:

a.  Daniel Lane Alpert ("Alpert"), Senior Vice President ("SVP"), Commercial Group manager, and a member of the Bank's Board of Directors and LC, may be served and resides at 1767 Bradburn Dr. St. Louis, MO 63131.

b.  Carlo DiMaria ("DiMaria"), Vice President and Commercial Relationship Manager, may be served and resides at 121 W Cascade Drive, Columbia, Illinois 62236.

c.  Jeffrey Nagle ("Nagle"), Chief Credit Officer ("CCO"), a member of the LC, may be served and resides at 12 Rainfield Court, Manchester, MO 63021.

d.  Robert Uthoff ("Uthoff"), Senior Vice President and Commercial Group Manager and a member of the Board of Directors and LC, may be served and resides at 2121 Telford Drive, St. Louis, MO 63125.

e.  Ben Charles Bono, III ("Bono"), a member of the Board of Directors and the LC, may be served and resides at 330 Dietrich Oaks, Manchester, MO 63021.

f.  Michael Denckhoff ("Denckhoff"), a member of the Board of Directors and the LC, may be served and resides at 8 Algonquin Wood, Glendale, MO 63122.

g.  Christopher Kehr ("Kehr"), a member of the Board of Directors and the LC, may be served and resides at 11141 Clayton Rd, Frontenac, MO 63131.

h.  Jeffrey Mugg ("Mugg"), a member of the Board of Directors and the LC, may be served and resides at 626 N. Geyer, St. Louis, MO 63122.

i.  John Prentis ("Prentis") Interim Chief Executive Officer ("CEO") and Chairman of the Board of Directors and member of the the LC, may be served and resides at 1553 Palisades Road, Wildwood, MO 63021.

4

j.   Paxton Schneider ("Schneider"), a member of the Board of Directors and the LC, may be served and resides at 4041 Maple Bluff Drive, Columbia, MO 65203.

## III.   JURISDICTION AND VENUE

9.   This Court has subject matter jurisdiction for this action pursuant to 12 U.S.C. § 1811 et seq., 12 U.S.C. § 1819(b)(1) and (2), and 28 U.S.C. §§ 1331 and 1345.  The FDIC is a corporation organized and existing under the laws of the United States of America, and brings this action in its receivership capacity.  Actions to which the FDIC is a party are deemed to arise under the laws of the United States.  The FDIC, including in its capacity as Receiver, has the authority to sue and complain in any court of law, and is empowered to pursue claims held by the Bank, including its claims against the defendants.  12 U.S.C. § 1819.

10.   This Court has personal jurisdiction over the defendants, who at all relevant times resided and/or conducted business in the State of Missouri.  As officers and/or directors of the Bank, Defendants committed the tortuous acts giving rise to this action within the State of Missouri.

11.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because all or substantially all of the acts charged herein occurred in this District and the FDIC-R's claims arose in this District.

## IV.   ALLEGATIONS COMMON TO ALL COUNTS:

12.   On August 7, 2006, the Bank opened for business as a *de novo* institution.  Within six months of its opening, the Bank's total assets more than quadrupled from $15.4 million to $67.2 million.  By December 31, 2007, the Bank's assets had increased to $224 million.  The

Bank's rapid growth resulted primarily from the purchase of speculative out-of-territory participations and sub-participations with little or no independent underwriting.

13.     Most of these participations were purchased from or through Silverton Bank, N.A. ("Silverton"), Atlanta, Georgia, also known as "The Banker's Bank."  The participations purchased by Defendants involved large out-of-area development and construction projects, including those in Nevada, Arizona, and Idaho.  Defendants viewed these participations favorably, believing that they could increase the Bank's assets quickly with little effort or expense.  Many of these purchases violated Champion's Credit Policy and occurred at a time when the real estate market was in serious decline.

14.     Defendants ignored due diligence requirements mandated by federal banking regulations and Champion's Credit Policy, which required that participations be underwritten with the same scrutiny as direct loans.  Champion's management lacked the experience, capacity, or inclination to underwrite and assess the feasibility of large out-of-territory construction projects.

15.     The LC, in turn, approved participations without questioning the absence of important financial information, and despite obvious evidence that management was not performing independent underwriting.

16.     The out-of-territory participations purchased by Defendants frequently involved highly speculative development and construction projects that were running out of money in steeply declining markets.  Collateral was valued on a future as-completed basis and obligors lacked the financial capacity to fund the projects or repay their obligations.

17.     Participations also included interest-only payment terms and bank-financed interest reserves that masked the existence and extent of the problems.  In several instances, the

6

lead bank or another participant minimized its exposure to a stalling or failing project by selling a portion to Champion.

18.     Defendant DiMaria represented to the LC that he had been assured by Silverton representatives that Silverton would repurchase the participation interests upon the Bank's request.  Some, if not all, of the LC members recklessly relied on these representations and assurances without even inquiring whether a written agreement existed.  In fact, the participation agreements contained no such repurchase requirement.

19.     As of March 31, 2008, the Bank's out-of-territory lending totaled $62.2 million (311 percent of its Tier I Capital).  Many, if not most, of the purchased loan participations went into default and caused large losses, eroding the Bank's capital.  From November 2006 through October 2007, the Bank purchased approximately $15.67 million in loan participations from Silverton and affiliated banks, most of which were of poor quality and resulted in loss.

20.     Under Champion's Credit Policy, the LC was authorized to approve loans up to the Bank's lending limit.  The LC consisted of the CEO (Kirk Briden), CCO (Nagle), the two Commercial Group Managers (Uthoff and Albert), and at least four non-officer directors (Bono, Denckhoff, Kehr, Mugg, Prentis, and Schneider).  All of the Loss Transactions except one were approved unanimously by the LC.

21.     Under Champion's Credit Policy, the CCO was responsible for ensuring adherence to the Bank's Credit Policy, overseeing the loan documentation department, and "maintaining the Bank's excellent credit culture."

22.     Under Champion's Credit Policy, Defendants had a duty to underwrite and evaluate participations with the same credit standards as direct credit extensions, including a

"complete analysis and documentation of the quality of the credit obligation to be purchased including acceptable financing information."

23.     Under Champion's Credit Policy, Defendants had a duty to obtain specified financial information on borrowers and guarantors, including financial statements and tax returns.  Champion's Credit Policy also imposed a loan-to-value ("LTV") limit of 75 percent on land development loans and subdivision construction loans.

24.     Under Champion's Credit Policy the following loan characteristics were deemed undesirable:

    a.   The borrower has no deposit relationships with the Bank.

    b.   The source of repayment is unclear or unstable.

    c.   The borrower invests an insignificant amount of equity in the project or makes an insignificant down payment.

    d.   The borrower has a history of delinquency or no established credit record.

    e.   The borrower resides outside of the Bank's local community and has never been a member of the community

25.     With respect to exceptions, Champion's Credit Policy required as follows:

    a.   All exceptions are to be . . . noted by the loan officer and recorded on the Credit Decision Memorandum prior to requesting approval.

    b.   The exception should be mitigated by one or several very strong credit considerations which must be clearly justified and recorded.

    c.   Each time an exception is made, a memo will be written to the credit file by the officer approving the exception, specifying the exception made, why it was in the bank's best interest, and who approved it.  A copy of the memo will

be placed in the credit file and a second copy will be kept in an "Exceptions to Policy" file maintained by the Chief Credit Officer.

    d.  All bank loan officers must realize that it is a significant breach of board policy when . . . the board's exception-to-policy lending procedures are not followed.

26.    Defendants violated Champion's Credit Policy in numerous respects, and recommended and approved numerous undesirable loans, including the Loss Transactions.

27.    Seven of the Loss Transactions were participations purchased from or through Silverton, resulting in losses of $13.69 million.  One business line of credit, granted to a company with substantial operating losses (Visionary Imaging), and whose principal was subject to a $1 million federal tax lien, resulted in a $770,110 loss.  The other business line of credit, granted to Defendant Schneider who pledged only second mortgages, resulted in a $1.099 million loss.

28.    Defendant DiMaria was the principal underwriter on six of the seven participation Loss Transactions.  DiMaria violated Champion's Credit Policy and settled regulatory standards by failing to independently underwrite the transactions.  Instead, DiMaria either appended or copied verbatim the information provided by the lead bank into the Credit Decision Memorandum ("CDM") that was provided to his superiors and the LC.  Often, the information provided by the lead institution downplayed material adverse information about the obligors or the underlying development project.  DiMaria also failed to obtain required documentation and failed properly to identify and justify policy exceptions.

29.    Defendant Uthoff directly supervised DiMaria.  As officers, Defendants Alpert and Nagle were also responsible for overseeing and ensuring the initial quality and integrity of

Champion's underwriting.  Uthoff, Alpert, and Nagle failed to require loan officers to properly underwrite the Loss Transactions, and failed to require loan officers to provide complete and objective information to the LC.  In addition, Uthoff, Alpert, and Nagle recommended that the LC approve Loss Transactions even though it was obvious that the transactions were not properly underwritten and violated Champion's Credit Policy and prudent lending standards.

30.     The Defendant LC members violated their duties to the Bank by acceding to management's reckless lending practices and by approving the Loss Transactions even though the CDMs contained obvious violations of policy and fundamental principles of safe and sound banking.

31.     With respect to the seven participations, it must have been obvious to the LC members that management was not independently underwriting participations as required by Champion's Credit Policy and applicable regulations.  Worse still, the participations involved stalling out-of-territory development and construction projects -- including projects in Nevada, Arizona, and Idaho -- with insolvent or struggling developers who were attempting to stay afloat in steeply declining markets.  LC members were also grossly negligent in accepting oral representations by DiMaria that participations could simply be sold back to the lead or another bank upon request, without enquiring whether any such agreement existed in writing.

32.     As officers and/or directors of the Bank, Defendants had a duty to adhere to the Bank's Credit Policy, federal banking regulations, and to exercise due care in underwriting, recommending and approving participations and lines of credit.

33.     Between August 7, 2006 and April 30, 2010, Defendants breached their duties, causing the Bank to approve participations and lines of credit that would not have been granted had Defendants complied with the Bank's Credit Policy, adhered to federal banking regulations,

followed prudent, safe, and sound lending practices, and conducted the required due diligence, including basic underwriting procedures.

34.    Defendants engaged in negligence, gross negligence, and breach of fiduciary duty in that, among other things, they:

    a.    Recommended and approved speculative out-of-territory participations with little or no independent underwriting in violation of federal regulation and Champion's Credit Policy;

    b.    Recommended and approved speculative out-of-territory participations where the obligors were unable to repay the obligation to the lead bank;

    c.    Recommended and approved out-of-territory participations that were substantially undercollateralized and which were based upon a speculative future value of the property;

    d.    Recommended and approved speculative out-of-territory participations in projects located in steeply declining markets at a time when other banks were seeking to minimize their exposure to such projects;

    e.    Recommended and approved speculative out-of-territory participations without conducting feasibility studies or otherwise independently assessing the viability of the project under existing market conditions:

    f.    Recommended and approved participations and lines of credit without obtaining financial information required by Champion's Credit Policy;

    g.    Recommended and approved an undercollateralized line of credit in violation of the Bank's Credit Policy to a board member who was experiencing financial difficulty;

11

h.   Recommended and approved a line of credit to a financially troubled business whose principal was subject to a $1 million federal tax lien; and

i.   Recommended and approved participations and lines of credit without obtaining appropriate appraisal reviews as required by the Bank's Credit Policy;

35.    Due to an egregious breakdown in checks and balances, there were repeated violations of the Bank's Credit Policy and prudent lending standards throughout the lending process.  The Defendants who underwrote and recommended the Loss Transactions to the LC failed to obtain required financial information, failed to conduct even minimal underwriting analysis, failed to heed obvious "red flags," and submitted CDMs to the LC that lacked objective analysis of the collateral, obligors, or the feasibility of development and construction projects. LC members failed to familiarize themselves with and require adherence to the Bank's Credit Policy and fundamental principles of safety and soundness, failed to exercise independent judgment with respect to the Loss Transactions, acceded to management's failure to perform proper underwriting, and inappropriately relied on dubious oral representations regarding the repurchase of participations.

36.    Less than four years after it opened for business, Champion failed, with an estimated loss to the FDIC's Deposit Insurance fund of $64.6 million.  As a result of Defendants' negligence, gross negligence, and breach of fiduciary duty, the Bank suffered more than $15.56 million in damages on the following Loss Transactions:

## PARTICIPATIONS PURCHASED

| Loss Transaction | Amount | Loss | Approval Date | Responsible Defendants |
|---|---|---|---|---|
| WHM Merrill Ranch | $2,500,000 | $1,503,052 | 11-7-2006 | Uthoff, Alpert, Nagle, Mugg, Bono, Denckhoff, Prentis, Kehr |
| BOJ Homes at Twin Lakes, LLC | $2,375,000 | $1,293,614 | 2-7-2007 | DiMaria, Uthoff, Alpert, Nagle, Kehr, Schneider, Mugg, Denckhoff, |
| MME LLC | $2,377,100 | $2,028,331 | 3-7-2007 | DiMaria, Uthoff, Alpert, Nagle, Kehr, Schneider, Mugg, Denckhoff, |
| Wildridge at 7 Lakes, LLC | $3,400,000 | $2,114,985 | 3-14-2007 | DiMaria, Uthoff, Alpert, Nagle, Kehr, Denckhoff, Schneider, Mugg, Bono One person declined |
| Myrtle Grove Investments | $3,600,000 | $3,184,091 | 6-6-2007 | DiMaria, Uthoff, Alpert, Denckhoff, Schneider, Kehr, Mugg. Prentis, Nagle |
| Power Development, LLC | $1,000,000 | $562,316 | 8-8-2007 | DiMaria, Alpert, Denckhoff, Uthoff, Schneider, Kehr, Mugg, Bono, Nagle |
| Wilde-Idaho Development, LLC | $3,500,000 | $3,004,480 | 8-8-2007 | DiMaria, Alpert, Denckhoff, Uthoff, Schneider, Kehr, Mugg, Bono, Nagle |

**DIRECT EXTENSIONS OF CREDIT**

| Loss Transaction | Amount | Loss | Approval Date | Responsible Defendants |
|---|---|---|---|---|
| Visionary Imaging | $2,000,000 | $770,110 | 7-11-2007 | Nagle, Alpert, Denckhoff, Uthoff, Schneider, Kehr, |
| David Atkins Paxton Schneider | $1,400,000 | $1,098,813 | 10-10-2007 | Alpert, Denckhoff, Uthoff, Kehr, Mugg, Prentis |

37.     Defendants Alpert, Denckhoff, Kehr, and Uthoff recommended or approved all the Loss Transactions and each directly and proximately caused $15.56 million in damages.  The other Defendants directly and proximately caused damages in the following amounts:

   a.   Mugg – $14.8 million;

   b.   Nagle – $14.5 million;

   c.   Schneider – $13 million;

   d.   DiMaria – $12.2 million;

   e.   Prentis – $5.8 million; and

   f.   Bono – $5.7 million.

38.     As an example, in March 2007, Defendants purchased a speculative out-of-territory $2.38 million sub-participation from Silverton of an $18 million loan to MME, LLC ("MME").  The lead institution, New South Federal Savings Bank ("New South"), Irondale, Georgia, was a small community bank closely affiliated with Silverton.

39.     The purpose of the loan was to renew and restructure existing loans, pay off subordinated debt, fund tax payments, and fund a $1.5 million interest reserve for a large residential development project in Las Vegas, Nevada.  The project was under stress, the market

was declining, and the borrower was unable or unwilling to pay the property taxes.  The LTV

ratio was an excessive 75 percent -- and not even based upon the existing value of the property,

but on an estimated future value upon completion.

40.     Defendant DiMaria did not independently underwrite the participation.  Instead,

he relied entirely on Silverton to provide financial information, cutting and pasting the

information Silverton provided into the CDM.  DiMaria failed to obtain required financial

information and failed to identify the absence of this information as a policy exception.  He

could not explain why Champion would want to lend money on a project for which the borrower

could not even pay the taxes.

41.     At an administrative deposition, DiMaria conceded that the MME transaction was

"very speculative."  DiMaria further testified that he informed the LC about the declining real

estate market in Las Vegas but that none of the LC members raised any questions or objections

to the transaction.

42.     The Defendant LC members who approved the MME transaction knew or

recklessly disregarded the fact that DiMaria did not perform independent underwriting on the

MME transaction.  LC members had been warned previously by the Bank's Credit Risk Manager

that global debt service analyses were not being performed on guarantors, but they failed to take

corrective action.  Defendant LC members also recklessly relied upon oral assurances from

DiMaria that Silverton would simply repurchase participations upon request.

43.     Moreover, the Defendant LC members approved the MME participation despite

numerous red flags on the face of the CDM showing that the participation interest was based on

a troubled if not failing out-of-area project to which another bank was seeking to eliminate or

minimize its exposure.  The CDM reflects that the loan was a restructuring to pay off debt, fund

15

tax payments, and fund an interest reserve.  The CDM further shows that there was another bank "whose portion became available," indicating that another bank was unable or unwilling to restructure the project.  The CDM identified the rapid decline in the Las Vegas real estate market, noting that total sales were down 42 percent (year over year) and that there was a 24.9-month supply of unsold inventory of detached homes.  One document submitted to the LC identified the primary source of repayment as "orderly sale of lots," while another identified the source as a "guidance line."  The Bank lost $2,028,331 on this $2.38 million participation.

## V.      CAUSES OF ACTION

### COUNT I – NEGLIGENCE
### (All Defendants)

44.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-43 above as if fully set out in this Count.

45.     Defendants owed the Bank and its depositors a duty to exercise the degree of diligence, care, skill, and good faith that ordinarily prudent persons in like positions would exercise under similar circumstances in underwriting, recommending, and approving the Loss Transactions, including, but not limited to, a duty to

      a.   Familiarize themselves with the nature of their obligations as officers and directors of a federally insured bank;

      b.   Conduct proper due diligence and inquiry into proposed transactions before recommending and approving them;

      c.   Adhere to the Bank's Credit Policy and to banking regulations;

      d.   Underwrite participations and lines of credit in a safe and sound manner;

      e.   Grant credit only to borrowers with the ability to repay;

    f.   Require valuable collateral security and guarantees to minimize the risk of loss to the Bank;

    g.   Exercise independent judgment in the best interest of the Bank in the conduct of its business affairs; and

    h.   Perform their duties as officers and directors faithfully and diligently.

46.    In disregarding their duties as directors and officers of the Bank (including the duties described in the preceding paragraph), Defendants failed to exercise that degree of diligence, care, judgment, skill and good faith that ordinarily prudent persons would have exercised under similar circumstances in like positions.

47.    Defendants' negligent acts and omissions directly and proximately caused substantial damage in an amount to be proven at trial but that exceeds $15.56 million.

## COUNT II – GROSS NEGLIGENCE
### (All Defendants)

48.    The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-43 above as if fully set out in this Count.

49.    Under 12 U.S.C. § 1821(k), officers and directors of federally insured financial institutions may be held personally liable for loss or damage caused by their "gross negligence," as defined by applicable state law.

50.    When Defendants underwrote, recommended, and approved the Loss Transactions, Defendants knew or recklessly ignored a high risk of loss on these transactions, as previously alleged herein.  In the face of these obvious and serious risks, Defendants nonetheless recommended and approved the Loss Transactions and, as such, committed gross negligence.

51.     Defendants' purchase of speculative out-of-territory participations without independent underwriting constituted reckless lending and gross negligence.

52.     Defendants' acceptance, without reasonable inquiry, of oral assurances that Silverton would repurchase speculative out-of-territory participations upon request constituted gross negligence.

53.     Defendants' lack of familiarity with the Bank's Credit Policy and fundamental principles of safety and soundness constituted gross negligence.

54.     Defendants' repeated violation of the Bank's Credit Policy and fundamental principles of safety and soundness in underwriting, recommending, and approving the Loss Transactions constituted reckless lending and gross negligence.

55.     Defendants' gross negligence directly and proximately caused substantial damage in an amount to be proven at trial but that exceeds $15.56 million.

## COUNT III – BREACH OF FIDUCIARY DUTY
### (All Defendants)

56.     The FDIC-R re-alleges and incorporates by reference the allegations contained in paragraphs 1-43 above as if fully set out in this Count.

57.     As officers and directors of the Bank, Defendants owed to the Bank fiduciary duties of care and loyalty, including duties of honesty, full disclosure, and the obligation to exercise their responsibilities in good faith and in the best interests of the Bank.

58.     As fiduciaries, Defendants' were obligated to place the Bank's interest above their own interests, and above the interests of the other officers and directors. The Bank reasonably reposed trust and confidence in Defendants.  Defendants knew or should have known that the Bank was placing its trust and confidence in them with respect to the underwriting,

recommendation, and approval of the Loss Transactions and in adhering to the Bank's Credit Policy.

59.     With respect to the Loss Transactions, Defendants possessed significant access to relevant knowledge and facts due to their special position of power at the Bank and the confidence they invited others to repose in them with respect to such transactions.

60.     As part of their fiduciary duties, Defendants had a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them, and to act with requisite care and loyalty in the discharge of their duties.

61.     For each transaction, Defendants had a fiduciary duty to obtain and analyze the value and sufficiency of collateral, the financial creditworthiness of the borrowers and guarantors, the LTV ratio, and any other information necessary to ensure that proposed transactions complied with the Bank's Credit Policy and prudent, safe, and sound banking practices.

62.     As officers and/or directors of the Bank, and as individuals underwriting, recommending, and/or approving the Loss Transactions, Defendants were in a special position of influence and power, and each of them exercised that influence and power in a manner that directly caused harm to the Bank.

63.     The Defendants breached their fiduciary duties to the Bank by committing the acts and omissions alleged above and, among other things:

> a.  Approved and funded the Loss Transactions in violation of Bank policies;
>
> b.  Approved and funded the Loss Transactions without undertaking a meaningful independent analysis of the repayment ability and creditworthiness of borrowers and guarantors;

     c.   Approved and funded the Loss Transactions based on grossly deficient collateral and without requiring adequate sources of repayment;

     d.   Approved and funded a line of credit to Defendant Schneider in which Schneider's interest was placed above the interests of the Bank;

     e.   Relied without inquiry into oral representations that participations would be repurchased upon demand;

     f.   Failed to reasonably inform themselves of their fiduciary obligations; and

     g.   Failed to conduct the affairs of the Bank in compliance with safe, and sound principles of banking.

64.    As a direct and proximate result of the Defendants' breaches of fiduciary duties, Plaintiff has suffered damages in excess of $15.56 million.

## VI.   RELIEF REQUESTED

**WHEREFORE**, the FDIC-R demands a trial by jury and judgment in its favor and against the Defendants as follows:

65.    Determining the amount of damages, jointly and severally, caused by the Defendants in excess of $15.56 million;

66.    Determining the amount of accrued interest (including pre-judgment interest) on such damages;

67.    Awarding the FDIC-R the full amount of damages and accrued interest;

68.    Awarding the FDIC-R its costs and other expenses incurred by it in connection with this proceeding; and

69.    Granting the FDIC-R such other and further relief as this Court may deem just and proper under the circumstances.

**VII.     JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38, the FDIC-R demands a jury trial.

<div style="margin-left:40%">

Respectfully Submitted,

**FIELDS & BROWN, LLC**

By:     /s/ Taylor Fields_____
Taylor Fields MO# 21371
1100 Main, Suite 1600
Kansas City, Missouri 64105
(816) 474-1700 Telephone
(816)421-6239 Telefax
tfields@fieldsandbrown.com

**ATTORNEY FOR PLAINTIFF**

</div>